UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

CHRISTINE H.,[1]

    Plaintiff,

v.                                    Civil Action No. 2:22-cv-260

KILOLO KIJAKAZI,
*Acting Commissioner of*
*Social Security*,

    Defendant.

### REPORT AND RECOMMENDATION

Plaintiff Christine H. seeks judicial review of the Commissioner of Social Security's denial of her claim for disability benefits ("DIB") and supplemental security income benefits ("SSI") under the Social Security Act ("the Act"). Specifically, Plaintiff argues that the Commissioner's Administrative Law Judge ("ALJ") improperly evaluated medical opinion evidence from Plaintiff's treating provider and failed to consider Plaintiff's limitation to one- or two-step tasks when crafting her residual functional capacity ("RFC"). This action was referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. §§ 636(b)(1)(B) and (C),

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

and Rule 72(b) of the Federal Rules of Civil Procedure. This Report concludes the ALJ adequately considered the medical opinion evidence and Plaintiff's functional limitations, and therefore recommends that the court grant the Commissioner's motion for summary judgment, deny Plaintiff's motion for summary judgment, and affirm the final decision of the Commissioner.

## I.   <u>PROCEDURAL BACKGROUND</u>

This case has a relatively complicated procedural history due to Plaintiff's filing of overlapping disability benefit applications over many years. On December 16, 2004, Plaintiff first filed for disability benefits, alleging disability beginning August 1, 2004. (R. 54). That application was denied initially, upon reconsideration, and by a decision at the hearing level dated December 19, 2006. (R. 54-61). Plaintiff then filed another application, and in a determination dated January 5, 2009, was found disabled as of December 1, 2007. (R. 65). On April 18, 2014, it was determined that Plaintiff was no longer disabled as of April 1, 2014. <u>Id.</u> That determination was upheld upon reconsideration, and by a decision at the hearing level dated February 29, 2016. (R. 65-77). The combined effect of these decisions is that Plaintiff has been previously adjudicated disabled during the period from December 1, 2007, through April 1, 2014. (R. 28-29).

Relevant to this case, Plaintiff filed again for DIB under Title II of the Act on December 31, 2018, and for SSI under Title XVI of the Act on January 7, 2019.  (R. 102, 115, 256-62, 266-72). She again alleged disability beginning January 1, 2004, based on epilepsy, chronic obstructive pulmonary disease ("COPD"), and a blood clotting disorder.  (R. 289).  In light of Plaintiff's prior applications, her December 2018 DIB filing and January 2019 SSI filing -- as well as the Commissioner's decision on those applications -- effectively span two periods: (1) January 1, 2004 (the alleged onset date) through November 30, 2007 (the day before she was previously adjudicated to be disabled); and (2) April 1, 2014 (the date she was previously adjudicated no longer disabled) through the date of the ALJ's decision.

The state agency denied the relevant applications initially and on reconsideration.  (R. 174, 185, 201, 205).  Plaintiff then requested an administrative hearing.  (R. 211-12).  The hearing was held on October 6, 2020.  (R. 2232-51).  Counsel represented Plaintiff at the hearing, and an impartial vocational expert ("VE") testified.  Id.  On November 4, 2020, the ALJ denied Plaintiff's claims for DIB and SSI, finding she was not disabled during the periods alleged.  (R. 25-45).  Regarding the period from January 1, 2004, to November 30, 2007, the ALJ found that Plaintiff had no severe impairments.  (R. 32).  Regarding the period from April 1, 2014 through the date of the decision, the ALJ found that Plaintiff

did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 33-36).  He also found that Plaintiff's RFC permitted her to perform work within the national economy.  (R. 44-45).  On March 4, 2021, the Appeals Council denied Plaintiff's request for review.  (R. 8-10).

On June 28, 2022, Plaintiff filed her complaint in this court. Compl.  (ECF No. 1).  She seeks judicial review of the Commissioner's final decision that she was not disabled, claiming that "[t]he agency committed error of law by denying Appeals Council review" and that "the conclusions and findings of fact of the [Commissioner] are not supported by substantial evidence and are contrary to law and regulation." Id. ¶¶ 8, 10 (ECF No. 1, at 2-3).  On November 8, 2022, Plaintiff moved for summary judgment. (ECF No. 16).  Plaintiff argues that the case should be reversed or remanded because "[t]he ALJ's RFC determination was not supported by substantial evidence because he failed to properly evaluate the opinion of Dr. Hambaz," one of Plaintiff's treating providers.  Pl.'s Mem. Supp. Mot. Summ. J. ("Pl.'s Mem.") (ECF No. 17, at 8-16).  Plaintiff also contends that the ALJ "failed to incorporate Plaintiff's limitation to 1-2 step tasks into the RFC." Id. at 16-17.

Both errors Plaintiff asserts relate to the ALJ's finding that she was not disabled during the second period of alleged

4

disability at issue -- that is, from April 1, 2014, through the date of the ALJ's decision.  Mem. Supp. Def.'s Mot. Summ. J. & Opp'n Pl.'s Mot. Summ. J. ("Def.'s Opp'n") (ECF No. 20, at 4 n.2, 21).  Plaintiff's brief asserts no error regarding the ALJ's analysis of the first period of alleged disability, which was from the onset date of January 1, 2004, through November 30, 2007.  Id. As such, the Commissioner's responsive briefings and this Report focus solely on the ALJ's determination regarding the period of alleged disability beginning April 1, 2014.

The Commissioner opposed Plaintiff's motion and moved for summary judgment.  (ECF No. 19).  The Commissioner argues that substantial evidence supports the ALJ's evaluation of Dr. Hambaz's opinion and his assessment of Plaintiff's RFC.  Def.'s Opp'n (ECF No. 20, at 21-28).  Plaintiff replied.  (ECF No. 23).  After a review of the record, this Report considers each of these arguments.

## II.  **FACTUAL BACKGROUND**

Plaintiff was born on March 11, 1975, and at the time of the ALJ's decision, she was 45 years old.  (R. 43).  She met the insured status requirements under the Act until September 30, 2017. (R. 31).  She has not engaged in substantial gainful activity since January 1, 2004, the alleged onset date.  (R. 31).  She has at least a high school education and reported past work as a claims adjuster.  (R. 290).

A.    **Plaintiff's Health Treatment**

Plaintiff's arguments in this court do not require a complete review of her extensive medical history, as she disputes only the ALJ's assessment of certain medical opinions and mental limitations relevant to his determination of Plaintiff's RFC in her most recent applications for benefits.  The treatment Plaintiff received, as relevant to the instant motions, is outlined below.

1.    **Primary Care Treatment**

Plaintiff's primary care provider, with whom she has treated for many years, is Nasser Hambaz, M.D. at First Choice Medical Center ("First Choice Medical").  Prior to the relevant period of alleged disability beginning on April 1, 2014, Dr. Hambaz treated Plaintiff for numerous conditions and documented an extensive problem list, which included, as relevant here: bipolar disorders; anxiety; depressive disorder; attention deficit disorder; idiopathic peripheral autonomic neuropathy; hypertension; arteritis; thromboembolic disorder; pain in the ankle and foot joints; lumbago; adhesive capsulitis of the shoulder; and edema. (R. 1229, 1231, 1233-36, 1238, 1240).  Many conditions were added to Plaintiff's problem list after April 1, 2014, including anemia, migraines, epilepsy, and a smoking habit.  See, e.g., (R. 1176, 1200, 1213).

Throughout the alleged period of disability, Plaintiff met with Dr. Hambaz and other providers at First Choice Medical on

6

many occasions.  Dr. Hambaz's examination findings remained largely consistent and unremarkable across these appointments. For example, on January 23, 2015, Plaintiff met with Dr. Hambaz for a follow-up appointment after a hospital visit and complained of "ankle edema, [deep vein thrombosis], pain in her back and leg, [and] severe anemia." (R. 1219). Dr. Hambaz conducted a physical examination and found Plaintiff used a cane and had limited ambulation, limited range of motion, muscle tenderness, and edema. (R. 1220). However, she also had normal gait and station; intact sensation, reflexes, cranial nerves, and coordination; and no tremor. Id.

On February 19, 2015, Plaintiff reported to Dr. Hambaz again with complaints of muscle aches and a left-hand injury. (R. 1211). Dr. Hambaz's physical examination noted bruising on Plaintiff's fingers, but otherwise found normal ambulation, gait and station, and muscle strength.  (R. 1212).  The next month, Plaintiff presented to Dr. Hambaz complaining of weight gain.  (R. 1202). She claimed "that as a result of a left knee surgery and recent [deep vein thrombosis] to the same leg she has limited exercise tolerance due to pain." Id.  On physical examination, Dr. Hambaz noted that Plaintiff was obese but, again, was ambulating normally and had a normal gait and station.  (R. 1202-03).  He recommended she quit smoking and placed her on a trial of a weight loss medication.  (R. 1203).

7

On July 7, 2015, Plaintiff reported to Ester Jakawich, NP with concerns regarding a growing and tender bruise on her right leg. (R. 1187). Following abnormal labs indicating the possibility of another deep vein thrombosis, Plaintiff was directed to report to the emergency department at Sentara Leigh Hospital. (R. 752-53, 1187). Plaintiff followed-up with NP Dalai two days later and reported "no muscle aches, no muscle weakness, no arthralgias/joint pain, no back pain, and no swelling in the extremities," as well as "no seizures, no dizziness, and no headaches." (R. 1183-84). On physical examination, she was found to have normal ambulation, normal gait and station, and no edema in her extremities. (R. 1184). She also had intact reflexes, cranial nerves, sensation, and coordination, with no tremor. Id.

Over the next several months, Plaintiff did not make any complaints at her appointments and her providers largely made the same, normal findings on examination. (R. 1137, 1140, 1143, 1145-46, 1149, 1155, 1158-59, 1161-62, 1165, 1168, 1171, 1174-75, 1178, 1181). Then, on January 6, 2016, Plaintiff presented with a complaint of chronic intermittent swelling to her lower left extremity. (R. 1133). However, NP Dalai again found no edema and noted that Plaintiff had normal muscle strength, movement in all extremities, and a negative Homan's sign. (R. 1134). Plaintiff reported feeling well and again produced largely normal physical examination results at each of her subsequent appointments through

the end of 2017.   (R. 1031, 1034-35, 1038, 1042, 1045-46, 1049-50, 1053-54, 1057, 1060-61, 1064, 1067, 1070-71, 1074, 1077, 1081, 1084-85, 1088, 1091, 1094-95, 1101, 1104, 1108, 1111, 1114-15, 1117, 1120-21, 1123-24, 1127, 1130-31).

On January 23, 2018, Plaintiff presented to First Choice Medical for a follow-up on a hospital visit due to a recent increase in seizure activity. (R. 1895). On physical examination, she was again found to have normal gait and station; intact nerves, sensation, reflexes, and coordination; normal muscle strength; normal movement in her extremities; and no edema. Id. A few weeks later, on February 5, 2018, Plaintiff reported "severe sudden onset [of] left lower leg pain with swelling from her foot to her calf." (R. 1891).   On physical examination, she had normal muscle strength, sensation, and coordination, but also exhibited tenderness, limited range of motion, edema in her left leg, diminished reflexes, and an irregular gait.   Id.   Dr. Hambaz directed Plaintiff to report to the hospital.   (R. 1672).

On May 8, 2018, Plaintiff reported "chronic fatigue, joint pain, back pain, and leg pain" but once again had normal physical findings when examined. (R. 1886-87). Plaintiff's providers at First Choice Medical continued to document normal findings on physical examination at nearly every subsequent appointment through the end of June 2020, including at an appointment in September 2018 following-up on a hospital visit for a seizure.

(R. 1826, 1830, 1835, 1839, 1843-44, 1848, 1852, 1856, 1860, 1865, 1869-70, 1877-78, 1882-83, 2032, 2037-38, 2042, 2046, 2051, 2056-57, 2068-69, 2074-75, 2081-82, 2087). The only exception was a June 6, 2018, appointment at which Plaintiff complained of "edema to both lower legs." (R. 1870). During a review of systems, Plaintiff reported muscle aches, arthralgias/joint pain, and back pain. (R. 1873). On physical examination, Dr. Hambaz found plaintiff had edema in both legs, but was ambulating normally with no tenderness. (R. 1874).

Additionally, and notably, at her appointment on August 8, 2019, Plaintiff asked Dr. Hambaz to complete a disability form indicating that she could not work. (R. 2076). Dr. Hambaz noted that he told Plaintiff her providers at First Choice Medical would not fill out the form. (R. 2076). He indicated that they had declined to complete the form because "we believe she is able to work." Id.

### 2. Emergency Hospital Treatment

In addition to her primary care treatment with Dr. Hambaz and his staff, Plaintiff consistently received emergency hospital treatment for various conditions during the alleged period of disability. For example, on January 19, 2015, Plaintiff presented to the emergency department of Sentara Obici Hospital in Suffolk complaining of shortness of breath. (R. 978). Following testing,

she was admitted with symptomatic anemia and instructed to follow up with Dr. Hambaz upon discharge.  (R. 984-85).

A few months later, on June 5, 2015, Plaintiff experienced dizziness and light-headedness and was taken by ambulance to the emergency department of Sentara Leigh Hospital in Norfolk.  (R. 756).  A physical examination was conducted and Plaintiff was found to have a normal range of motion, 5/5 strength in all extremities, and no edema.  (R. 758).  On July 7, 2015, following abnormal labs indicating the possibility of another deep vein thrombosis, Plaintiff reported to the emergency department at Sentara Leigh Hospital at the direction of Dr. Hambaz's office. (R. 752-53, 1187).  On physical examination at the hospital, Plaintiff was found to have normal range of motion and no tenderness.  (R. 754).

Three days later, on August 10, 2015, Plaintiff was hospitalized at Sentara Virginia Beach General Hospital due to a lung infection.  (R. 733).  She reported pain and discomfort in her chest but denied any joint pain.  (R. 735).  During an initial physical examination, her doctors found edema, but concluded she had a normal range of motion and no tenderness.  Id.  She stayed in the hospital for several days and was discharged in stable condition.  (R. 749).

On November 13, 2015, Plaintiff was taken via ambulance to Sentara Leigh Hospital following a series of seizures lasting

approximately two minutes. (R. 729-30). During the seizures, Plaintiff lost consciousness and was observed with rhythmic jerking, but once at the hospital, she denied having chest pains or headaches. (R. 730). She discharged in stable condition following scans of her head and chest, which returned normal results and no acute abnormalities. (R. 733).

Plaintiff presented to the emergency department at Sentara Leigh Hospital again on February 9, 2016, following a motor vehicle accident in which another car struck the passenger side of the vehicle Plaintiff was driving. (R. 722). Plaintiff said she hit her head on the steering wheel and complained of mild pain in her head, neck, and back. (R. 723). On physical examination, she had full strength in her extremities and had a normal gait. (R. 724-25). Scans to her cervical spine revealed moderate degenerative discogenic disease at C6-C7, but scans of her head and lumbar spine were normal. (R. 725).

A few months later, on June 16, 2017, Plaintiff reported to the emergency department at Sentara Virginia Beach General Hospital complaining of migraines. (R. 715). She rated her pain as a 6/10. (R. 718). On physical examination, her providers found normal range of motion, strength, and sensation. (R. 716).

In late 2017, Plaintiff presented at the emergency department of Sentara Virginia Beach General Hospital on three occasions within three months, each time on account of seizures. (R. 699,

703, 708).  At the latter two encounters, which occurred on November 22 and December 1, 2017, Plaintiff admitted she may have missed doses of her seizure medication, Topamax.  (R. 703-04).  At each of the three encounters, she was found with normal physical examination findings and no neurological damage.  (R. 700-11).

On February 5, 2018, Plaintiff presented at the emergency department in Virginia Beach at Dr. Hambaz's direction, this time due to leg swelling.  (R. 1810).  Scans of her leg and foot showed "soft tissue swelling" but "no acute fractures or subluxation."  (R. 1813).  She was diagnosed with cellulitis and discharged.  (R. 1812).  After another seizure, Plaintiff went to the hospital in Virginia Beach again on September 10, 2018.  (R. 1787).

From February through March of 2018, Plaintiff reported to the hospital at least four times with various emergencies which were unrelated to any seizure.  On February 2, she complained of shoulder pain, (R. 1780-81); on February 27, she reported on account of anxiety, (R. 1772); on March 1, she reported with headaches or migraines, (R. 1767); and on March 9, she arrived with a knee injury, (R. 1750).  When reporting for her knee injury, the examining physician found tenderness but concluded Plaintiff had normal range of motion in all joints with no obvious edema. (R. 1744-45).

### 3.   Pain Management Treatment

During the alleged period of disability, Plaintiff also treated with pain management specialists to whom she was referred by Dr. Hambaz and others at First Choice Medical.   One such provider was the Bon Secours Center for Pain Management ("Center for Pain Management").   Prior to April 1, 2014, providers at the Center for Pain Management had, like Dr. Hambaz, documented an extensive problem list for Plaintiff, including, as relevant here: complex regional pain syndrome; neuropathic pain; recurrent deep vein thrombosis; knee pain; leg swelling; arthritis of the left knee; sacroiliitis; chronic bilateral low back pain with bilateral sciatica; and cigarette smoking.   (R. 397).

On March 27, 2015, Plaintiff reported to the Center for Pain Management for a follow-up on chronic pain.   (R. 399).   She reported pain in her knee, shoulder, and lower back, which she rated as 5/10 in severity.   (R. 400).   Samantha Allen, RN, noted that Plaintiff was stable and tolerating her current medication. Id.

Approximately three months later, on June 18, 2015, Plaintiff presented to the Center for Pain Management for another follow-up on her knee and back pain.   (R. 416).   She was seen by Gerry N. Smith, M.D., who noted that Plaintiff's medications helped with her pain control and quality of life.   (R. 419).   During a review

of systems, Plaintiff reported back pain and joint pain, but denied experiencing recent seizures.  Id.

Plaintiff returned to the Center for Pain Management on August 7, 2015, with complaints of back and knee pain, as well as a "new pain" in her hip.  (R. 430).  She described her pain as "burning" and claimed it had worsened since her last visit.  (R. 433).  She rated her new hip pain was a 7/10 in severity and said it sometimes radiated into her lateral thighs.  Id.  According to Plaintiff, nothing helped, and activity made the pain worse.  Id.  On physical examination, Raymond Clifton, PA, observed edema in Plaintiff's left foot but otherwise made normal findings.  Id.

The same complaints and findings were made on September 9 and November 4, 2015, although PA Clifton noted at Plaintiff's November appointment that "she is doing better today than her last visit." (R. 453-54, 467-69).  On December 30, 2015, PA Clifton again documented "a mild improvement since last visit" and noted that Plaintiff was exercising and stretching at home, with some improvement.  (R. 483).  On physical examination, PA Clifton's findings were unremarkable.  (R. 484).

This general pattern -- Plaintiff reporting chronic pain and her pain management providers noting normal examination findings and improvement with medication -- continued through the end of 2019.  (R. 499-500, 520-22, 534-36, 549-551, 572-73, 587-88, 600-02, 622-24, 638-40, 661-63, 685-86, 1251-53, 1270-71, 1307-09,

1337-39, 1370, 1411, 1444, 1951-53, 1957-59, 1963-65, 1970-71).
Plaintiff was then referred by Dr. Hambaz to Antonio Quidgley-
Nevares, M.D., and Barbara Hadden, NP at EVMS Medical Group. (R.
2023). She presented on February 5, 2020 and demonstrated
tenderness on examination, but also full range of motion in her
knees, shoulders, and spine. (R. 2024). Her sensation was intact,
her gait was normal, and she had full strength in her extremities.
Id. Her provider's findings on examination were largely similar
at her next appointment in March 2020. (R. 2021).

At the direction of Eric Jones, M.D. -- one of Plaintiff's
providers at the Center for Pain Management -- Plaintiff also began
treating in 2020 with physiatrist Beth Winke, M.D. (R. 2138). On
July 13, 2020, Plaintiff presented to Dr. Winke complaining of
muscle aches, muscle weakness, arthralgias/joint pain, back pain,
and swelling in the extremities, seizures, frequent/severe
headaches, migraines, and depression. (R. 2138). On physical
examination, Dr. Winke found lumbar spine tenderness and pain with
motion, as well as absent left ankle reflexes. (R. 2139).
Plaintiff had normal gait and station and full motor strength
despite her pain. Id. A few weeks later, Plaintiff met with Dr.
Winke again and complained of pain in her lower back and knee,
which she rated as an 8/10 in severity at worst and a 4/10 with
her medications. (R. 2133). On physical examination, Dr. Winke

found no tenderness and concluded that Plaintiff was ambulating normally.  Id.

### 3.  Rheumatology Treatment

On July 11, 2018, Plaintiff was seen by Andrew Miller, D.O. at Sentara Rheumatology Specialists upon referral by NP Dalai. (R. 1805).  On physical examination, Dr. Miller found full range of motion in Plaintiff's joints, as well as normal strength and tone in all extremities. (R. 1807).  Her senses and reflexes were also intact.  Id.

### 4.  Neurology Treatment

Plaintiff also treated intermittently with several neurologists during the alleged period of disability.  Initially, she treated for epilepsy and migraines with Firas Beitinjaneh, M.D. at Neurology Specialists.  (R. 991-93, 1016-18).  On August 25, 2014, Plaintiff reported for an appointment with Dr. Beitinjaneh. (R. 987).  Dr. Beitinjaneh noted that Plaintiff took Topamax, was "tolerating [it] well," and experienced fewer migraines and no seizures in recent months.  Id.  He conducted a physical examination and found that Plaintiff was alert, had 5/5 strength in all extremities, and walked with a normal gait.  (R. 988).

Subsequently, at an appointment with First Choice Medical, Plaintiff requested a new neurology referral and NP Dalai duly referred her to Habeeb Rahman, M.D. for treatment of her epilepsy

and migraines.  (R. 885-86, 889, 1178).  On October 5, 2015, Dr. Rahman indicated that Plaintiff was doing well and had not had any recurrence of seizures.  (R. 949).  He found that Plaintiff was "neurologically stable" with "unchanged and unremarkable" examination results.  Id.  She had normal tone, mass, and strength in all her muscles, as well as intact cranial nerves and reflexes. Id.  Her gait was "within normal limits."  Id.  Dr. Rahman made the same findings when reevaluating Plaintiff on June 13, 2016. (R. 938).

Subsequently, Plaintiff also received treatment from Dr. Rahman's colleague, Eric Goldberg, M.D.  (R. 1514-35).  On February 15 and April 12, 2018, Dr. Goldberg noted that Plaintiff had not had any seizures after another medication, Keppra, had been added to her regime.  (R. 1520, 1523).  At her next appointment, on June 14, 2018, Plaintiff reported intermittent migraines.  (R. 1524).

The following month, Dr. Goldberg again noted her lack of seizures and improvement on Topamax, "with less headaches as well." (R. 1526).  In September 2018, Plaintiff reported having a recurrence of seizures, but Dr. Goldberg noted this was because she missed several doses of her Keppra medication.  (R. 1528).  At her next follow-up appointment, Dr. Goldberg found Plaintiff "doing well on her current treatment regime" and had no issues with seizures since her last visit. (R. 1530-31).

18

### 5.   Mental Health Treatment

As made clear by the summary above, many treating providers physically examined Plaintiff during the alleged period of disability.  Many of these examinations included brief psychiatric evaluations, which were consistently unremarkable.  See, e.g., (R. 1207, 1220).  For example, Dr. Hambaz found Plaintiff to be alert, oriented, and in a normal mood.  Id.  He also reported Plaintiff had normal recent memory and remote memory.  Id.  In addition to these evaluations, Plaintiff also received specialized mental health treatment with providers at Seaside Behavioral Health, Tidewater Psychotherapy Services, and Solutions Psychotherapy.

On December 1, 2016, Scott Kane, PA-C at Solutions Psychotherapy noted that Plaintiff was being treated for ADHD and depression, but that she was presently stable.  (R. 385-86).  On examination, he noted that she had normal thought processes and intact judgment, and was oriented, alert, and euthymic.  Id.

On February 15, 2018, Plaintiff presented to Jennifer Brown, NP-C at Seaside Behavioral Health for treatment of depression, anxiety, and ADHD.  (R. 1512).  Plaintiff reported that she sought mental health treatment for the first time after a sexual assault in junior high school -- an incident from which she suffered residual trauma.  Id.  Plaintiff also reported developing depression after a suicide in her family.  Id.

Six days later, Plaintiff reported to Seaside Behavioral Health again and was seen by therapist Abby Calisch. (R. 1511). She said "her life has been a series of disasters and bad luck," reporting additional traumas including homelessness, an abusive marriage, and losing custody of her daughter. Id. Calisch noted that Plaintiff's mood was sad, anxious, and tearful, but that her insight and judgment were intact, as was her memory and attention. Id.

On March 12, 2018, Calisch again observed Plaintiff in an anxious or sad mood and noted depressive symptoms such as a lack of energy or motivation. (R. 1510). Plaintiff reported that she "just tries to get through one day at a time." Id. Calisch found Plaintiff's attention was sporadic, but also found that Plaintiff demonstrated intact memory, judgment, and perception. Id. Calisch made similar findings regarding Plaintiff's memory, judgment, and attention span at two subsequent appointments that month and three appointments in April 2018. (R. 1504-06, 1508-09).

On June 5, 2018, Plaintiff reported doing better and Calisch found her mood was stable. (R. 1502). She presented later that day tearful, reporting her disability benefits application had been denied. (R. 1501). At both appointments, Calisch again noted Plaintiff's intact memory, judgment, and perception, as well as her intermittent attention span. (R. 1501-02).

Plaintiff reported to NP-C Brown on August 2, 2018, that she was not going to pursue work at that time due to the onset of her other health issues. (R. 1500). Plaintiff was observed in a stable mood and with "less distractable" attention. Id. Her recent memory, remote memory, judgement, and impulse control were all fair and intact. Id. NP-C Brown made these same findings at Plaintiff's next two appointments on September 26 and December 20, 2018. (R. 1497-98). At the December appointment, Plaintiff reported that her medications were effective. (R. 1497). Plaintiff presented again in February 2019 and reported "doing alright." (R. 1718).

After being discharged from Seaside Behavioral Health, Plaintiff began treatment with Ashley Lyons, PA at Tidewater Psychotherapy Services for depression and anxiety. (R. 1945). On July 31, 2019, Plaintiff reported symptoms including "depressed mood, hopelessness, loss of interest, weight gain and poor sleep." Id. On examination, PA Lyons found that Plaintiff "display[ed] ability to recall recent and remote events," and noted that her memory, thought processes and judgment were normal. (R. 1946). The following month, Plaintiff presented again and was seen by Danielle Gange, NP, who also noted that Plaintiff had been "doing well" and had normal memory, judgment, and behavior. (R. 1944). PA Lyons' findings at Plaintiff's next appointment in September 2019 were largely similar. (R. 1942).

On October 22, 2019, Plaintiff reported that she was grieving the death of her father but was "holding up well."   (R. 1939). She also reported experiencing moderately severe distractibility, racing thoughts, shortness of attention span, impulsive behavior, forgetfulness, and careless mistakes.   Id.   Plaintiff claimed she felt stable on her current medications, and PA Lyons again found Plaintiff's memory to be intact.   (R. 1940).   PA Lyons renewed her largely unremarkable findings regarding Plaintiff's memory, thought processes, and judgement at six subsequent appointments between January 2020 and June 2020.   (R. 1194-2006).

**B.   Opinion Evidence**

**1.   State Agency Consultative Examiners[2]**

**a.   Howard Leizer, Ph.D.**

On March 21, 2019, when Plaintiff's claims for DIB and SSI were pending at the initial level, state agency psychologist Howard Leizer, Ph.D. conducted a review of Plaintiff's medical records. (R. 93-94, 97-99).   He opined that Plaintiff had moderate limitations in understanding, remembering, or applying information; mild limitations interacting with others; moderate limitations in concentrating, persisting, or maintaining pace; and

---

[2] All opinions from the state agency's consultive examiners were rendered for the purposes of evaluating Plaintiff's SSI claim, as they found the evidence insufficient to evaluate Plaintiff's DIB claim based on her expired date last insured.   (R. 42, 104-14, 151-61).

mild limitations in adapting or managing herself.  (R. 93-94).
However, he also opined that, despite moderate limitations with
detailed instructions, Plaintiff was "[a]ble to understand and
remember 1-2 step instructions and simple work procedures."  (R.
98).  Consequently, Dr. Leizer concluded that, "[a]lthough the
claimant may have difficulty sustaining performance of detailed
tasks . . . the evidence shows the claimant to be capable of
understanding, recalling, and carrying out simple routine tasks
with minimal social demands over a normal workday/workweek."  Id.

    **b.   Richard Surrusco, M.D.**

Plaintiff's medical records were also reviewed at the initial
level by state agency medical consultant Richard Surrusco, M.D.
(R. 95-97).  On March 22, 2019, Dr. Surrusco opined that Plaintiff
could occasionally lift or carry 20 pounds; frequently lift or
carry 10 pounds; stand, sit, or walk for around six hours each in
an eight-hour workday; occasionally crawl and climb ramps or
stairs; frequently balance, stoop, kneel, and crouch; never climb
ladders, ropes, or scaffolds; and should avoid even moderate
exposure to hazards like machinery and heights.[3]  Id.

---

[3] Dr. Surrusco made these opinions using the following definitions:
"frequently" means "cumulatively 1/3 up to 2/3 of an 8 hour day," and
"occasionally" means "cumulatively 1/3 or less of an 8 hour day."  (R.
95).

### c.   Joseph Leizer, Ph.D.

On December 11, 2019, when Plaintiff's claims for DIB and SSI were pending at the reconsideration level, state agency psychiatrist Joseph Leizer, Ph.D. conducted a review of Plaintiff's medical records. (R. 125-26, 129-30). Like Dr. Howard Leizer at the initial level, Dr. Joseph Leizer opined that Plaintiff had moderate limitations in understanding, remembering, or applying information; mild limitations interacting with others; moderate limitations in concentrating, persisting, or maintaining pace; and mild limitations in adapting or managing himself.  (R. 125).  Dr. Joseph Leizer also agreed with Dr. Howard Leizer's findings regarding Plaintiff's limitations with detailed tasks, ability to complete simple or one- to two-step tasks, and potential to function at work.  (R. 129-30).

### d.   Nicolas Tulou, M.D. and Bert Spetzler, M.D.

Plaintiff's medical records were also reviewed at the reconsideration level by Nicolas Tulou, M.D. and Bert Spetzler, M.D. (R. 127-29, 145-47).  Like Dr. Surrusco at the initial level, Dr. Tulou and Dr. Spetzler opined that Plaintiff could occasionally lift or carry 20 pounds; frequently lift or carry 10 pounds; stand, sit, or walk for around six hours each in an eight-hour workday; occasionally crawl and climb ramps or stairs; frequently balance, stoop, kneel, and crouch; never climb ladders, ropes, or scaffolds; and should avoid even moderate exposure to hazards like machinery

and heights.[4]  Id.  They also added the additional limitation that Plaintiff should avoid concentrated exposure to extreme cold.  (R. 128, 146).

    2.    **Plaintiff's Treating Providers**

        a.    **Nasser Hambaz, M.D.**

On August 21, 2020, Dr. Hambaz completed a medical evaluation report, which is a form listing certain questions about Plaintiff's work capabilities.  (R. 2125-27).  He diagnosed Plaintiff with depression, anxiety, PTSD, ADD, lymphedema, a history of deep vein thrombosis, epilepsy, migraines, gout, scoliosis, sciatica, and COPD.  (R. 2125).  He also indicated that Plaintiff had an impaired gait and multiple medication regimens.  Id.

Dr. Hambaz opined that Plaintiff's condition -- and specifically her lymphedema, migraines, and sciatica -- caused her daily pain of a severity that would affect her ability to stay on task at work.  Id.  Additionally, he explained that Plaintiff's pain required extra rest breaks that would force her to be off task for more than one hour in an eight-hour workday.  Id.  Dr. Hambaz further opined that Plaintiff required bedrest that would prevent her from reporting to work 30 days per month on average. Id.  As a result, he concluded that Plaintiff is unable to work

---

[4] Dr. Tulou and Dr. Spetzler made these opinions using the same definitions used by Dr. Surrusco.  (R. 127, 145).

full time at any level of exertion.   (R. 2126).   He described
Plaintiff's prognosis for recovery as "fair."   (R. 2127).

## C.   Testimony Before the ALJ

At the hearing on October 6, 2020, the ALJ heard testimony
from Plaintiff and impartial VE, Linda Augins.   (R. 2232–51).

### 1.   Plaintiff's Testimony

On direct questioning by her attorney, Plaintiff testified
that she lived in subsidized housing with a live-in aide who helped
her with "daily tasks such as house cleaning and cooking and
laundry."   (R. 2239).   She said she received $204 per month in
food stamps as well as periodic financial assistance from friends
and family as needed.   Id.   She graduated from high school and
completed a year-and-a-half of community college.   Id.   Plaintiff
testified that she had not worked since 2004.   (R. 2240).

Plaintiff's counsel questioned Plaintiff regarding her
condition and medical treatment during the period from April 2016
to September 2017.[5]   Plaintiff testified that, during that period,

---

[5] As noted above, on February 29, 2016, Plaintiff received an unfavorable
decision adjudicating her not disabled as of April 1, 2014.   (R. 65-77).
At the hearing, Plaintiff's counsel indicated to the ALJ that he planned
to advise Plaintiff to amend her alleged onset date to April 20, 2016 --
approximately two months after that unfavorable decision.   (R. 2237).
He stated he would confer with Plaintiff on the matter after the hearing
and that the ALJ could expect an amended alleged onset date to follow.
Id.   As such, Plaintiff's counsel's questioning at the hearing focused
on the period from April 2016 through September 30, 2017, which was
Plaintiff's date last insured.   (R. 31, 2237, 2240-43).   However,
Plaintiff never amended her alleged onset date after the hearing and the
ALJ's assessed Plaintiff's filings using the original onset date alleged
therein.

she treated with the Center for Pain Management, First Choice Medical, and Solutions Pyschotherapy.[6] (R. 2240-42). She said Dr. Hambaz at First Choice Medical was her primary care physician who "basically handles issues that [she] had for over 20 years, such as chronic urinary tract infections." (R. 2241). She claimed Dr. Hambaz referred her to the Center for Pain Management "for chronic pain of [her] back and [both] knees." Id. According to Plaintiff's testimony, Psychotherapy Solutions was treating her "for depression, which [she has] suffered from since [she] was a small child." (R. 2242). She also noted that she "was diagnosed late in life with ADD and PTSD due to trauma." Id.

Regarding her impairments, Plaintiff testified that she "can only walk for very short distances without pain" in her legs due to scoliosis and sciatica. Id. She said when standing in place "no more than five minutes" or sitting, her back hurts and pain shoots down her legs. Id. She also reported suffering from lymphedema due to a blood clotting disorder, which causes her left foot and calf to swell to the point that she is precluded from wearing shoes. Id. To manage the swelling and pain, Plaintiff

---

[6] The record also reflects that, during this period, Plaintiff presented several times to the emergency department of Sentara Virginia Beach General Hospital complaining of various ailments. (R. 711-22).

testified that she lays down two to three hours a day.  (R. 2243).
She also claimed she can only lift around five pounds.  Id.

Plaintiff testified that all of these symptoms had gotten
progressively worse from 2016 through 2020.  Id.  She attributed
this progression to her depression, claiming that worsening of her
depression would cause her pain to intensify, and vice versa.  Id.
She described feeling "like a failure and a loser" due to her
inability to support herself and her 15-year-old daughter.  (R.
2243-44).  Plaintiff described a "vicious cycle" in which her
illnesses prevent her from being a "normal mother," which only
causes more grief and depression.  (R. 2244).

Plaintiff's counsel also asked Plaintiff questions
specifically about Plaintiff's seizure disorder.  Plaintiff
testified that she was diagnosed with juvenile myoclonic epilepsy
at age 14 and has "always" had grand mal seizures.  Id.  She said
she takes Topamax, which also helps with her migraines.  Id.  She
claimed that her seizures "have no warning signs," so when a
seizure begins, she "just fall[s] over and start[s]
fainting . . . stop[s] breathing and [has] to be resuscitated."
Id.  Plaintiff explained that the sudden onset and debilitating
nature of these seizures make it necessary for her live-in-aide or
another person to be with her at all times, ready to render aid or
call for assistance.  (R. 2244-45).

Plaintiff reported that her last seizure was approximately a year before the hearing and was "extremely violent." (R. 2245). She claimed that she frequently experienced multiple seizures in quick succession, which leaves her "in a fog" and "completely depleted" for days. Id. She also explained that her driver's license has been medically revoked multiple times throughout her life due to her seizures, the last time being approximately a year before the hearing. Id.

Finally, Plaintiff testified regarding her anemia. She described having been rushed to the emergency room in 2015 or 2016 due to a drop in iron levels. Id. She claimed to have spent two weeks in the hospital and had an emergency blood transfusion. Id. While Plaintiff acknowledged that her anemia "doesn't bother [her] on a day-to-day basis," she said "it will pop it's ugly head up and make [her] feel weak and tired." (R. 2246).

### 2. Testimony from VE Augins

Linda Augins is an impartial VE. (R. 2234). At the hearing, the ALJ's hypothetical posited a person with the same age, education, and work experience as Plaintiff who was capable of "light work" with the following limitations:

> [T]he individual should avoid overhead work
> activity; avoid pushing and pulling. The
> individual has to avoid climbing ladders,
> ropes and scaffolds, but could perform other
> postural movements occasionally; is limited to
> low stress tasks. Low stress is defined as
> work with no more than occasional change in

> the routine and work that allows the
> individual to avoid fast pace tasks such as
> assembly line jobs as well as production
> quotas; is limited to occasional interaction
> with the public and co-workers; is limited to
> frequent fingering, grasping, handling, and
> reaching; avoid work around hazards such as
> moving dangerous machinery and unprotected
> heights; avoid concentrated exposure to
> respiratory irritants and extreme
> temperatures and humidity; avoid brightly lit
> and noisy work conditions, but office level
> noise and lighting are okay. Work environment
> should have close proximity to an accessible
> restroom, such as in an office setting on the
> same floor.

(R. 2246-47). The VE testified that the following "light" jobs would be available to such a person: postage machine operator (DOT 208.685-026) with 21,000 jobs nationally, and mail sorter (DOT 209.687-026) with 23,000 jobs nationally. (R. 2247). The VE also testified that the following "sedentary" jobs would be available to such a person: call-out operator (DOT 237.367-014) with 9,000 jobs nationally, and document preparer (DOT 249.587-018) with 45,000 jobs nationally. (R. 2248).

In response to the ALJ's follow-up questions, the VE testified that if the hypothetical individual required a sit/stand option or the use of a cane for ambulating, they could still perform the specified jobs. (R. 2248-49). However, the light jobs identified would be precluded if the person "could lift and carry no more than five pounds." (R. 2249). Additionally, the VE testified that all work would be precluded if the hypothetical person "would

have to lie down and rest one or more hours during an eight-hour work day." Id.

### III. STANDARD OF REVIEW

In reviewing a decision of the Commissioner denying benefits, the court is limited to determining whether the decision was supported by substantial evidence on the record and whether the proper legal standard was applied in evaluating the evidence. 42 U.S.C. § 405(g); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)). It consists of "more than a mere scintilla" of evidence, but the evidence may be somewhat less than a preponderance. Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966).

The court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996); Hays, 907 F.2d at 1456. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)." Craig, 76 F.3d at 589. The Commissioner's

31

findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed. Perales, 402 U.S. at 390; see also Lewis v. Berryhill, 858 F.3d 858, 868 (4th Cir. 2017). Ultimately, reversing the denial of benefits is appropriate only if either the ALJ's determination is not supported by substantial evidence on the record, or the ALJ made an error of law. Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## IV. ANALYSIS

Plaintiff's brief identifies two errors in the ALJ's decision that she claims warrant remand. First, she argues that "[t]he ALJ's RFC determination was not supported by substantial evidence because he failed to properly evaluate the opinion of Dr. Hambaz." Pl.'s Mem. (ECF No. 17, at 8-16). Plaintiff also contends that the ALJ "failed to incorporate Plaintiff's limitation to 1-2 step tasks into the RFC." Id. at 16-17. The Commissioner argues that substantial evidence supports the ALJ's evaluation of Dr. Hambaz's opinion and Plaintiff's RFC. Def.'s Opp'n (ECF No. 20, at 21-28). As explained below, this Report finds that the ALJ adequately evaluated the medical opinion evidence in the record and Plaintiff's limitations. Accordingly, this Report concludes that remand is not warranted, and therefore recommends that the court affirm the Commissioner's decision.

A.    **Framework for SSA Disability Evaluation**

A person may file for and receive disability insurance benefits under the Social Security Act if he or she meets the insured status requirements of 42 U.S.C. § 423(c)(1), is under the retirement age as defined in § 416 of the Act, and is under a disability as defined in § 423(d).  As relevant here, the Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A); accord 20 C.F.R. § 404.1505(a).  An impairment renders an individual disabled only if it is so severe as to prevent the person from engaging in his or her prior work or any other substantial gainful activity that exists in the national economy.  See 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1505(a).

SSA regulations set out a sequential analysis which ALJs use to make their determination.   20 C.F.R. § 404.1520(a)(4). Specifically, the regulations direct the ALJ to answer the following five questions:

1.    Is the individual involved in substantial gainful activity?

2.    Does the individual suffer from a severe impairment or a combination of impairments that meets the durational requirement and significantly limits his

or her physical or mental ability to do basic work activities?

3. Does the individual suffer from an impairment(s) that meets or equals a listing in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (a "listed impairment") and meets the durational requirement?

4. Does the individual's impairment or combination of impairments prevent him or her from performing any relevant past work?

5. Does the individual's impairment or combination of impairments prevent him or her from performing any other work?

An affirmative answer to question one, or a negative answer to questions two, four, or five, means the claimant is not disabled. An affirmative answer to questions three or five establishes disability. The claimant bears the burden of proof during the first four steps; if the analysis reaches step five, the burden shifts to the Commissioner to show that other work suitable to the claimant is available in the national economy. See Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995); Jolly v. Berryhill, No. 16-cv-38, 2017 WL 3262186, at *6 (E.D. Va. July 13, 2017).

The SSA considers all material evidence in evaluating whether a claimant is disabled. 20 C.F.R. §§ 404.1520(a)(3); 404.1520b. This includes "(1) the objective medical facts; (2) the diagnoses and expert medical opinions of the treating and examining physicians; (3) the subjective evidence of pain and disability; and (4) the claimant's educational background, work history, and

present age." <u>Jolly</u>, 2017 WL 3262186, at *6 (citing <u>Hayes v.</u> <u>Gardner</u>, 376 F.2d 517, 520 (4th Cir. 1967)). Ultimate responsibility for making factual findings and weighing the evidence rests with the ALJ. <u>Hays</u>, 907 F.2d at 1456 (citing <u>King v. Califano</u>, 599 F.2d 597, 599 (4th Cir. 1979)).

**B.    The ALJ Decision Currently Before the Court for Review.**

At step one, the ALJ found Plaintiff had not engaged in substantial gainful activity from her alleged disability onset date until the hearing date. (R. 31). At step two, the ALJ found that Plaintiff suffered from no severe impairments from January 1, 2004, through November 30, 2007. (R. 32). However, regarding the period from April 1, 2014, through the date of the decision, the ALJ found that Plaintiff suffered from the following severe impairments: bipolar/depressive disorder; attention-deficit hyperactivity disorder; post-traumatic stress disorder; migraine headaches; disorders of the cervical and lumbar spine status-post fusion surgery; bilateral knee disorder; venous insufficiency and a history of deep vein thrombosis; and obesity.[7]  <u>Id.</u>

At step three, the ALJ found that Plaintiff did not suffer from a listed impairment or combinations of impairments that met

---

[7] The ALJ found Plaintiff's seizure disorder "to be nonsevere given the very sporadic seizure episodes shown in the current medical evidence." (R. 33). He also noted that "almost all of these episodes appear to be related to medication noncompliance or the absence of a seizure medication." <u>Id.</u>  Plaintiff did not challenge this finding in her appeal of the Commissioner's final decision.

or medically equaled the severity of one of the listed impairments.

(R. 33).  The ALJ then developed a finding regarding Plaintiff's

RFC.   (R. 36-37).  He determined Plaintiff was able to perform

light work, except that

> the claimant has to avoid overhead work
> activity.  The claimant has to avoid pushing
> and pulling.   The claimant has to avoid
> climbing ladders, ropes, and scaffolds, but
> she can perform other postural movements on an
> occasional basis.  The claimant is limited to
> low stress tasks with low stress defined as
> requiring work with no more than occasional
> change in the routine and work that allows her
> to avoid fast-paced tasks such as assembly
> line jobs involving production quotas.   The
> claimant is limited to occasional interaction
> with the public and co-workers.  The claimant
> is limited to frequent fingering, grasping,
> handling and reaching.   The claimant has to
> avoid working around hazards such as moving
> dangerous machinery and unprotected heights.
> The claimant has to avoid concentrated
> exposure to respiratory irritants, extreme
> temperatures and humidity.  The claimant has
> to avoid brightly lit and noisy working
> conditions but office level noise and lighting
> are okay.   The claimant's work environment
> needs to have close proximity to an accessible
> restroom such as in an office setting on the
> same floor.

Id.

    At step four, the ALJ concluded that Plaintiff had no past

relevant work.  (R. 43).  At step five, the ALJ found work in the

national economy Plaintiff could perform, and therefore found that

she was not disabled.  (R. 44-45).

**C.   The ALJ's Assessment of Plaintiff's Condition Was Proper and Supported by Substantial Evidence.**

Broadly, Plaintiff takes issue with the ALJ's assessment of her condition, arguing specifically that the ALJ erred by improperly evaluating Dr. Hambaz's medical opinion and failing to consider Plaintiff's functional limitations. Pl.'s Mem. (ECF No. 17, at 8-17). The Commissioner argues that substantial evidence supports the ALJ's evaluation of Dr. Hambaz's opinion and his formulation of Plaintiff's RFC. Def.'s Opp'n (ECF No. 20, at 21-28). Because the ALJ's evaluation of Dr. Hambaz's opinion and Plaintiff's functional limitations was appropriate and consistent with SSA regulations, this Report concludes that remand is not warranted, and therefore recommends that the court affirm the Commissioner's decision.

**1.   The ALJ properly evaluated the medical opinion from Plaintiff's treating provider.**

Under the applicable regulations,[8] the ALJ does "not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s) . . . ." 20 C.F.R. § 404.1520c(a). Instead, the ALJ considers their overall "persuasiveness," id., and while the ALJ

_____

[8] On January 18, 2017, the SSA adopted new rules for considering medical opinions and prior administrative medical findings. 20 C.F.R. § 404.1520c. The new rules apply to all claims filed after March 27, 2017. Id. Because Plaintiff protectively filed her claims on December 31, 2018, and January 7, 2019, (R. 102, 115, 256-62, 266-72), the new rules apply.

may consider many factors in evaluating persuasiveness, he or she must explain only "the most important factors" of "supportability and consistency," § 404.1520c(b)(2).  Supportability evaluates whether a medical source supports his or her opinion with "objective medical evidence and supporting explanations," § 404.1520c(c)(1), while consistency evaluates whether "evidence from other medical sources and nonmedical sources" also support the source's opinion, § 404.1520c(c)(2).

When evaluating a medical opinion under these rules, the ALJ cannot "cherrypick[] facts that support a finding of nondisability while ignoring evidence that points to a disability finding." Bilotta v. Saul, 850 F. App'x 162, 169 (4th Cir. 2021) (quoting Lewis, 858 F.3d at 869); see also Apr. R.D. v. Saul, No. 2:20-cv-210, 2021 WL 3260072, at *9 (E.D. Va. June 29, 2021) (recommending remand because the ALJ "selectively cherry-picked unrepresentative evidence"), R. & R. adopted by 2021 WL 3215093 (E.D. Va. July 29, 2021).  Cherry-picking occurs when an ALJ focuses on "a single treatment note that purportedly undermines [the source's] overall assessment of [the plaintiff's] functional limitations . . . ." Hudson v. Colvin, No. 12-cv-269, 2013 WL 6839672, at *8 (E.D.N.C. Dec. 23, 2013) (quoting Punzio v. Astrue, 630 F.3d 704, 710 (7th Cir. 2011)).

Here, when explaining his RFC determination, the ALJ first stated that he "considered the medical opinion(s) and prior

administrative medical finding(s) in accordance with the requirements of 20 CFR 404.1520c and 416.920c." (R. 37). The ALJ then assessed Dr. Hambaz's opinion specifically, concluding that the opinion was unpersuasive for several reasons. First, he explained that while Dr. Hambaz "opines that the claimant is unable to work full-time at any level of exertion . . . [w]hether or not the claimant is able to work is an issue reserved to the Commissioner." (R. 41). As such, the ALJ explained that Dr. Hambaz's opinion on this issue was "inherently neither valuable nor persuasive" to the disability determination. Id. Even so, the ALJ noted that this opinion was "not consistent with Dr. Hambaz's own previous statements." (R. 42). Specifically, the ALJ pointed out that "just one year prior to issuing this [opinion], Dr. Hambaz declined to fill out a form on the claimant's behalf stating that she could not work, as he believed that she could work." Id.

The ALJ next assessed Dr. Hambaz's opinions regarding Plaintiff's ability to focus and stay on task in the workplace, and the need for daily bedrest -- ultimately finding both opinions unpersuasive. (R. 42). Regarding supportability, the ALJ noted that

> Dr. Hambaz cites to a list of the claimant's
> conditions but does not otherwise explain the
> opinion. The opinion is not supported by Dr.
> Hambaz's treatment notes, either. Dr. Hambaz
> and the other providers in his office have

39

> routinely documented normal physical examination findings over the course of several years. Dr. Hambaz has never documented a problem with the claimant's ability to focus. As for the opinion that the claimant requires daily bedrest, this is an extreme limitation out of all proportion to his generally normal clinical findings.

Id. Regarding consistency, the ALJ explained that

> [t]he opinion is not consistent with the claimant's other treatment records, either. While the claimant did present with attention problems in 2018 with Seaside Behavioral Health, other providers have not documented such problems. The claimant's pain management records, neurology records, emergency room records, and imaging studies do not show evidence of any impairment or combination of impairments consistent with daily bedrest. This is also not consistent with the claimant's reports of walking, moving, and performing her own activities of daily living.

Id.

Plaintiff insists that these are "illegitimate reasons to discount Dr. Hambaz's opinion." Pl.'s Mem. (ECF No. 17, at 10). While she "does not dispute that a small portion of Dr. Hambaz's opinion spoke on an issue reserved for the Commissioner," Plaintiff contends that fact "would not be sound reasoning to find Dr. Hambaz's entire opinion less persuasive." Id. Moreover, Plaintiff complains that the ALJ failed to explain how Dr. Hambaz's prior refusal to opine that Plaintiff could not work was relevant to the consistency determination and, if anything, indicates her condition had worsened since that time. Id. at 11.

Plaintiff also contends that the ALJ's conclusions regarding the remainder of the opinion are incorrect and not supported by the record. Id. at 11-14. In support of that position, Plaintiff points to diagnoses and examination findings in Dr. Hambaz's treatment notes, as well as hospitalization and psychiatric records. Id. Plaintiff argues the ALJ ignored this evidence, choosing instead to cherry-pick favorable facts from the record. Id. at 12, 14. She also contends that the ALJ "failed to explain how [her] daily activities were inconsistent with a disabling opinion" and "penalize[s] [her] for attempting to lead a normal life despite her limitations." Id. at 14-15.

The Commissioner argues that the ALJ's analysis is supported by substantial evidence. Def.'s Opp'n (ECF No. 20, at 21). The Commissioner asserts that the ALJ correctly determined that Dr. Hambaz opined on an issue reserved for the Commissioner and, in reaching that conclusion, "made no statement suggesting" his analysis on that question "played any role in . . . his analysis" of the remainder of the opinion. Id. at 22-23. Regarding the supportability and consistency of the rest of the opinion, the Commissioner points to the ALJ's discussion of Dr. Hambaz's failure to elaborate on the reasoning behind the severe limitations he recommended; Dr. Hambaz's treatment notes documenting normal findings on physical examination over several years; and treatment notes from Plaintiff's psychiatric providers reaching different

41

opinions regarding Plaintiff's memory and ability to stay on task. Id. at 24.

The Commissioner also claims that Plaintiff's ability to perform daily activities was not the evidence on which the ALJ's decision turned -- it was merely additional evidence confirming the conclusion the ALJ reached based on the remainder of the medical record.   Id. at 26.   Additionally, the Commissioner disputes Plaintiff's contention that the ALJ cherry-picked the record, arguing that the specific evidence cited by the ALJ is consistent with the weight of evidence contained in the record. Id. at 25-26.  For the reasons explained below, I agree with the Commissioner.

First, the ALJ began his discussion of Dr. Hambaz's opinion by noting that Dr. Hambaz found "that the claimant is unable to work full-time at any level of exertion."  (R. 41).  Under the plain text of the applicable regulations, the issue of whether the claimant is able to work is reserved to the Commissioner. See 20 C.F.R. §§ 404.1520b(c)(3)(i), 416.920b(c)(3)(i). As such, the ALJ correctly concluded that Dr. Hambaz's opinion on Plaintiff's ability to work had no value or persuasive force.

Having made that determination, no further analysis or consideration of that portion of the opinion was required. However, the ALJ provided additional analysis explaining another basis for discrediting Dr. Hambaz's conclusion on that issue --

notably, Dr. Hambaz's prior inconsistent statement that he believed Plaintiff could work. (R. 42). Plaintiff's complaints about the ALJ's inclusion of this prior statement misunderstand the ground on which the ALJ's decision rests. The ALJ did not discount Dr. Hambaz's opinion that Plaintiff could not work <u>because</u> of Dr. Hambaz's earlier statement. In other words, the ALJ <u>did not rely</u> on Dr. Hambaz's prior statement in reaching his conclusion that Dr. Hambaz's opinion about Plaintiff's inability to work was unpersuasive. Rather, he merely provided dicta explaining another basis for discrediting that portion of Dr. Hambaz's opinion, which he had already fully discredited under the applicable regulations. Had the ALJ not included this dicta at all, his analysis and ultimate determination on this portion of Dr. Hambaz's opinion would not have changed.

Additionally, Plaintiff has provided no evidence that the ALJ's conclusion on this portion of Dr. Hambaz's opinion had any effect on his analysis of the rest of Dr. Hambaz's opinion. To the contrary, the ALJ stated outright that he "will not provide articulation" about Dr. Hambaz's opinion that Plaintiff could not work. (R. 41). And in his discussion of the remainder of the opinion, he neither mentioned nor cited to Dr. Hambaz's excluded statement even once. (R. 42). As such, the ALJ did not allow Dr. Hambaz's statement on an issue reserved for the Commissioner to taint his analysis of the rest of the opinion.

43

Having adequately dealt with this portion of the opinion, the ALJ then separately addressed the supportability and consistency of the remainder of the opinion as required by 20 C.F.R. § 404.1520c(b)(2), ultimately concluding that the opinion was unpersuasive because it was not supported by Dr. Hambaz's treatment notes and not consistent with other evidence in the record. Id. Regarding supportability, the ALJ referenced Dr. Hambaz's decision to list diagnoses in the opinion without explanation and his own treatment notes routinely documenting normal physical examination findings. (R. 41). Dr. Hambaz and his staff made such findings at most of their appointments with Plaintiff. (R. 1031, 1034-35, 1038, 1042, 1045-46, 1049-50, 1053-54, 1057, 1060-61, 1064, 1067, 1070-71, 1074, 1077, 1081, 1084-85, 1088, 1091, 1094-95, 1101, 1104, 1108, 1111, 1114-15, 1117, 1120-21, 1123-24, 1127, 1130-31, 1137, 1140, 1143, 1145-46, 1149, 1155, 1158-59, 1161-62, 1165, 1168, 1171, 1174-75, 1178, 1181, 1826, 1830, 1835, 1839, 1843-44, 1848, 1852, 1856, 1860, 1865, 1869-70, 1877-78, 1882-83, 2032, 2037-38, 2042, 2046, 2051, 2056-57, 2068-69, 2074-75, 2081-82, 2087). Regarding consistency, the ALJ referenced the absence of a documented attention problem (with the exception of treatment notes from Seaside Behavioral health), as well as Plaintiff's neurology, pain management, and hospital records being devoid of any evidence of a condition requiring daily bedrest. (R. 42). He also mentioned Plaintiff's ability to carry out daily activities.

Id.  While it would be improper to discredit Dr. Hambaz's opinion on this fact alone, it is nonetheless -- contrary to Plaintiff's assertion -- relevant to the question of whether a daily bedrest recommendation, like the one Dr. Hambaz imposed, is reasonable and credible.  The ALJ committed no error by relying on this fact in conjunction with the medical findings in the record.  The ALJ's discussion of all the above evidence demonstrates that he sufficiently considered the supportability and consistency of Hambaz's opinion as required by the SSA regulations.

Plaintiff points to numerous other pieces of evidence in the record that are supportive of and consistent with the conclusions in Dr. Hambaz's opinion, arguing that the ALJ cherry-picked the record for favorable evidence.  Pl.'s Mem. (ECF No. 17, at 11-15).  However, none of the records cited suggest any health care practitioner believed Plaintiff required daily bedrest as a result of her conditions.  And the facts the ALJ used to discount Dr. Hambaz's medical opinion were representative of the record as a whole.  See Arakas v. Comm'r, SSA, 983 F.3d 83, 99, 102 (4th Cir. 2020) (finding that the ALJ errs when misstating or mischaracterizing facts).  The ALJ thoroughly detailed the medical record in support of his RFC, highlighting numerous records contradicting the conclusions in Dr. Hambaz's opinion.  (R. 42).  The records cited and discussed corroborate the unremarkable examination findings in Plaintiff's providers' treatment notes

that the ALJ used to discount the severe limitations reported in Dr. Hambaz's opinion.  As such, the ALJ did not cherry-pick the record, and his conclusions regarding the supportability, consistency, and overall persuasiveness of Dr. Hambaz's opinion are supported by substantial evidence.

Additionally, reversal is not warranted simply because the record contains evidence which could support a conclusion opposite from the one reached by the ALJ.  The court must defer to the ALJ's findings if those findings are supported by substantial evidence.  Perales, 402 U.S. at 390; see also Lewis, 858 F.3d at 865.  This appeal is not an opportunity to relitigate the case.  If "conflicting evidence allows reasonable minds to differ as to whether [Plaintiff] is disabled," then the court defers to the ALJ.  Craig, 76 F.3d at 589 (quoting Walker v. Bowen, 834 F.2d 635, 640 (7th Cir. 1987)).  Because the ALJ's opinion here is supported by substantial evidence, the court does not consider whether the evidence might also support an alternative finding.  Thus, there was no error in the ALJ's evaluation of Dr. Hambaz's opinion and his decision to find the opinion unpersuasive is supported by substantial evidence.

### 2. The ALJ adequately considered Plaintiff's functional limitations.

Plaintiff next argues that the ALJ erred by failing to consider Plaintiff's mental health limitations when crafting the

RFC. Specifically, Plaintiff contends that the ALJ failed to incorporate a limitation to 1-2 step tasks in Plaintiff's RFC despite Dr. Howard Leizer having opined that Plaintiff could understand and remember such tasks. Pl.'s Mem. (ECF No. 17, at 16-17). The ALJ found Dr. Leizer's opinion to be "somewhat persuasive," but also explicitly found it unnecessary to impose a 1-2 step limitation in the RFC "given that the remainder of the record indicates good management of her symptoms." (R. 43). Plaintiff argues that the ALJ failed to explain this conclusion, which, she asserts is contrary to the evidence in the record. Pl.'s Mem. (ECF No. 17, at 16-17). The Commissioner disagrees, claiming that the ALJ carefully explained his decision not to include this limitation in the RFC, which is supported by substantial evidence in the record. Def.'s Opp'n (ECF No. 20, at 26-28). Again, I agree with Commissioner.

A finding of impairment at steps 2 and 3 does not require a pre-set corresponding limitation in a claimant's RFC. See Shinaberry v. Saul, 952 F.3d 113, 120–21 (4th Cir. 2020). Rather, when a limitation is not incorporated into the RFC, the ALJ need only provide a reasonable articulation as to why. Id. The same applies for limitations in a medical opinion.

Here, the ALJ discussed the evidentiary basis for his RFC at length. (R. 37-43). He referenced Plaintiff's mental health providers, her various diagnoses, and her consistently

unremarkable mental examination findings pertaining to memory. (R. 40-41). He explained that Plaintiff's records from Seaside Behavioral Health often indicated Plaintiff struggled with distractibility, but other times reflected that she had full attention. (R. 41, 43). He also noted that Plaintiff's results from "each and every mental status exam with [Tidewater Pyschotherapy] from July 2019 through June 2020 [was] entirely normal." Id. He also observed that the RFC would limit her to "a stable work setting to reduce distracting changes." (R. 43). This explanation sufficiently discharged the ALJ's duty to explain the reasons behind his RFC determination -- and specifically, his decision to not include a 1-2 step task limitation "given that the remainder of the record indicates good management of her symptoms." Id. As a result, I conclude that the ALJ appropriately considered Plaintiff's mental health impairments and the RFC is supported by substantial evidence.

### V. RECOMMENDATION

For the foregoing reasons, the undersigned recommends that the court GRANT the Commissioner's Motion for Summary Judgment, (ECF No. 19), DENY Plaintiff's Motion for Summary Judgment, (ECF No. 16), and AFFIRM the final decision of the Commissioner.

### VI. REVIEW PROCEDURE

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.   Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date this report is forwarded to the objecting party by Notice of Electronic Filing or mail, <u>see</u> 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure.  Rule 6(d) of the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail.  A party may respond to any other party's objections within fourteen (14) days after being served with a copy thereof.  <u>See</u> Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

2.   A district judge shall make a de novo determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this court based on such findings and recommendations.  <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Carr v. Hutto</u>, 737 F.2d 433 (4th Cir. 1984); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984).

/s/
Dou___ ___. Miller
United States Magistrate Judge

_____
DOUGLAS E. MILLER
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
June 15, 2023